**LOWER MOUNT BETHEL TOWNSHIP**

v.

**Clayton M. STINE, Clayton Stine, Jr., and DKS Services, Inc., Appellants.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Oct. 10, 1996.
Decided Nov. 15, 1996.

1396, 18 L.Ed.2d 493 (1967).

Gary Neil Asteak, Easton, for Appellants.

Christopher T. Spadoni, Bethlehem, for Appellee.

Before DOYLE and FRIEDMAN, JJ., and KELTON, Senior Judge.

KELTON, Senior Judge.

Clayton M. Stine, Clayton M. Stine, Jr. and DKS Services, Inc. (collectively "the Stines") appeal from the December 7, 1995 order of the Court of Common Pleas of Northampton County (Judge James C. Hogan) denying their motion for post-trial relief. We affirm.

## BACKGROUND

The Stines own a 146.81 acre property in Lower Mount Bethel Township, Northampton County, Pennsylvania. At issue in this case is the Township's June 28, 1993 petition for contempt primarily concerning the Stines' use of a portion of their property for commercial woodchipping operations. (R.R. 43–49a.) In the petition, the Township seeks 1) an order directing immediate compliance with prior court orders; 2) an order directing the immediate termination of operations on the property for the transportation, transfer and/or processing of solid waste, including but not limited to the processing of tree stumps, unless and until the appropriate land development plans and zoning permits have been obtained; 3) an order directing the Stines to pay counsel fees and costs of $15,-000.00 to the Township; and 4) an order directing the Stines to pay fines to the Township of $50,000.00 for continued willful, intentional and continuing violations of court orders.

At various hearings, the trial court heard the testimony of Clayton Stine, Jr., several Department of Environmental Protection (DEP) employees, the Township Zoning Officer, a man who videotaped the property and a representative from the United States Department of Agriculture, Farmers Home Administration (FHA). Based on the evidence adduced, the court concluded that the Stines were in willful contempt by conducting a commercial woodchipping business on their tract and by dumping and storing foreign debris thereon. The court found that the woodchipping operation far exceeded any contemplated farm use. (Trial Court's November 13, 1995 Opinion at 11.)

Specifically, the court found that the Stines created on their property piles of wood chips and stumps several hundred feet long, up to twelve to fifteen feet high, and one hundred feet wide. It found that there appears to be at least 2500 cubic yards of wood chips stored in piles and that the Stines accumulated stumps and wood chips at five times the rate at which they were able to sell them. At least some of the tree stumps were imported from New Jersey. (Trial Court's Opinion at 3; R.R. 89a.)

In addition, the court found that the Stines' woodchipping business, inter alia, entailed the use of heavy semi-trailer trucks, heavy tracked vehicles, front-end loaders and bulldozers. "Large trucks capable of carrying up to twenty-five cubic yards of chips have entered the property routinely since late May of 1993" and "[n]early two dozen heavy trucks move in and out of the subject property daily in connection with the tree stump chipping operation." (Id.) The court noted that the Stines have no certificate of occupancy or any other permit for the operation of a woodchipping business.

On November 3, 1995, the parties appeared before the court and advised it that the FHA had commenced foreclosure proceedings and that the Stines had filed a Chapter 12 petition in bankruptcy on November 1, 1995. In addition, counsel for the DEP advised the court that it had taken no action to force the Stines to clean-up the property or cease violating a December 10, 1992 consent order between the Stines and the DEP.[1]

---

1. On December 10, 1992, while trial court orders adjudicating the Stines to be in contempt were still in effect, the DEP and the Stines entered into a consent order to effect specific measures to plan for and to take steps for the elimination and clean-up of the solid waste on the property.

The trial court concluded that its remedies were limited by the Stines' adjudication in bankruptcy and that jurisdiction over the tract of land is now with the United States Bankruptcy Court. It found, however, that the Stines were in willful contempt by conducting a commercial woodchipping business and by dumping and storing foreign debris on their tract. It concluded that they willfully failed to comply with a bona fide effort to cause remediation of sixteen acres of contaminated soil. In short, it found that the Stines willfully and without justification violated the terms of the court's orders, directives of state law and requirements of local ordinances.

Accordingly, in a November 13, 1995 decree nisi, it ordered that the Stines be enjoined from entering the tract or employing or directing any person to enter onto the tract for any purpose directly or indirectly connected with the hauling or deposit of stumps, other wood sources or any other dumping materials.

## ISSUES

■ There are essentially two issues for our review: 1) whether the trial court erred in imposing its contempt order; and 2) whether the trial court erred in failing to require the Township to join the DEP as an indispensable party and in failing to relinquish original jurisdiction to the Commonwealth Court. Our scope of review when considering an appeal from a contempt order is limited to a review of whether the trial court abused its discretion or committed an error of law. *Richland Township v. Prodex, Inc.*, 166 Pa.Cmwlth. 313, 646 A.2d 652 (1994). When considering an appeal from a contempt order, great reliance must be placed upon the discretion of the trial judge. *Fenstamaker v. Fenstamaker*, 337 Pa. Superior Ct. 410, 487 A.2d 11 (1985).

(R.R. 1–42a.) The trial court noted that, "[u]nder the terms of the consent order, failure to comply with the consent order would cause the Stines to be subject to civil and criminal penalties at the instance of DEP." (Trial Court's Opinion at 4.)

## DISCUSSION

### 1. Trial Court's Remedies:

■ For several reasons, the Stines argue that the trial court erred in imposing the contempt order. They contend that the Township's contempt petition was insufficient to put them on notice of what evidence they needed to defend themselves and that the court should have directed the Township to provide a more specific pleading.

We have carefully examined the Township's contempt petition found at R.R. 43–49a. Therein, the Township specified the conduct at issue, "the transportation, dumping, disposal, transfer, and/or processing of various waste, including but not limited to tree stumps," and, in general, the ordinances and laws being violated. Inter alia, these include the permitted use provision of the Township's Zoning Ordinance, nuisance law and the Solid Waste Management Act.[2]

Additionally, as the trial court noted at the September 20, 1993 hearing, the court's prior contempt orders filed at docket No. 1988–CE–2779 and referenced in the contempt petition filed at the same number, provided that the Stines comply with all *zoning* requirements. Therefore, he permitted the Township to proceed with its case and present the Township zoning officer as its first witness in an attempt to establish that the Stines' use of their property was in violation of the Township's Zoning Ordinance.

We conclude that the contempt petition was sufficient to put the Stines on notice of what evidence they needed to defend themselves. For example, they presented certain witnesses in an attempt to establish that their use of the property for a woodchipping operation was not an impermissible. commercial use in an agricultural zone, but instead, a permissible agricultural use. We simply do not agree that they were prejudiced by the trial court's refusal to require the Township to file a more specific contempt petition.

2. Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §§ 6018.101—6018.1003.

Additionally, the Stines contend that the trial court's findings are not supported by competent, credible evidence. Specifically, they argue that the record does not support the trial court's finding that the woodchipping business is a commercial, non-agricultural use and that zoning and business permits are required for such a use. We disagree.

The Stines presented the testimony of Mr. Clayton Stine, Jr. to establish that the woodchipping operations on the property constituted an agricultural use. To the contrary, Mr. Stine testified that he and his son run businesses on the property, that some of the wood chips are sold to Agway, that some of them are sold to New Jersey landscapers and Christmas tree growers and that the trucking of the wood chips, firewood and soil has nothing to do with the agricultural crops on the property. (R.R. 114a, 115–116a, 118a.) Also, he testified that, although they mix some woodchips with lime and spread the mixture over shaley knobs prior to planting corn, they sell the majority of the chips. (R.R. 90–91a.)

In addition, Township Zoning Officer Richard Weaver testified that the Stines' property was located in both agricultural and conservation zoning districts and that, in his opinion, the wood processing constituted an industrial use. (R.R. 61a, 64a.) He further testified that the Stines had never filed any applications or sought any permits to use their property for the commercial woodchipping endeavor conducted thereon.[3] (R.R. 65a.) (Mr. Stine acknowledged that neither he nor his son had sought permits. (R.R. 96–97a.))

Accordingly, we conclude that the trial court's findings that the Stines' use of their property exceeded any farming use and that they were conducting a commercial woodchipping operation there in contravention of the law is supported by competent, credible evidence. Mr. Stine's testimony provides ample support for the trial court's findings in that regard.

Finally, the Stines argue that the trial court erred in imposing the contempt order because the record shows that they presently are financially unable to proceed with the cleanup of their contaminated land. To the contrary, we find that the trial court in its contempt order gave due consideration to the Stines' financial inability and recognized the authority of the United States Bankruptcy Court.

Under Section 362(b)(4) of the Bankruptcy Code, governmental units' "commencement or continuance of an action or proceeding . . . to enforce such governmental unit's police or regulatory power" is exempted from the automatic stay provision. 11 U.S.C. § 362(b)(4). Specifically, "[e]nvironmental enforcement actions brought by federal, state and local governmental units to recoup clean-up costs are exempted from the automatic stay by § 362(b)(4)." *U.S. v. Sugarhouse Realty*, 162 B.R. 113, 115 (E.D.Pa. 1993). *See also Department of Environmental Resources v. Peggs Run Coal Co.*, 55 Pa.Cmwlth. 312, 423 A.2d 765 (1980) (held that department's complaint in equity, charging the corporation with violations of air and water pollution statutes and regulations, and asking for affirmative relief and the posting of bonds, was a proceeding by a governmental unit to enforce its police or regulatory power under § 362(b)(4)). As the trial court noted, even though the governmental unit may be foreclosed from executing on any judgment it might obtain, it may, under most circumstances, seek injunctive relief to compel clean-up without violating the automatic stay. *U.S. v. Sugarhouse Realty*, 162 B.R. 113, 115 (E.D.Pa.1993); *U.S. v. Nicolet, Inc.*, 857 F.2d 202 (3d. Cir.1988); *Department of Environmental Resources v. Ingram*, 658 A.2d 435 (Pa.Cmwlth.1995) (single-judge opinion).

Here, the court did not order the Stines to conduct clean-up efforts; it simply ordered them to refrain from creating a big-

---

3. A certificate of occupancy was issued to fill a natural ravine with tree stumps. (R.R. 68–69a, 83a.) Mr. Weaver testified that the piles of wood that he observed on the Stine property were not in a ravine. (R.R. 83a.) The trial court obvious-

ly rejected the suggested inference that a certificate of occupancy issued for filling a ravine with tree stumps extended to conducting a large-scale woodchipping operation. *See* Trial Court's Findings of Fact Nos. 1 and 2.

ger problem that would entail even further clean-up in the future. Under the circumstances of this case, we find no abuse of discretion in the court's directive enjoining further prohibited activity on the Stines' property and, in fact, applaud it. A "polluter" simply cannot be permitted to continue to contaminate merely because the court may not be able to order him to pay a fine or the costs of clean-up.

## 2. DEP as Indispensable Party:

■ Citing *CRY, Inc. v. Mill Service, Inc.*, 536 Pa. 462, 640 A.2d 372 (1994), the Stines argue that the trial court erred in failing to require the Township to join the DEP as an indispensable party and in failing to relinquish original jurisdiction to this Court. We disagree.

In *CRY*, the Concerned Residents of Yukon, Inc. (CRY) and sixteen individual citizens of Yukon filed a complaint against Mill Service, Inc. alleging that they were harmed by the company's operation of its Yukon plant where it treats and stores hazardous waste. The *CRY* Court held that a citizen lawsuit under certain environmental statutes against an alleged polluter required the joinder of the DEP as an indispensable party and that the action should be heard in our Court's original jurisdiction. In reaching that conclusion, the Court applied the following four criteria:

1. Do absent parties have a right or interest related to the claim?
2. If so, what is the nature of that right or interest?
3. Is that right or interest essential to the merits of the issue?
4. Can justice be afforded without violating the due process rights of absent parties?

*CRY*, 536 Pa. at 468–9, 640 A.2d at 375 (quoting *Mechanicsburg Area School District v. Kline*, 494 Pa. 476, 481, 431 A.2d 953, 956 (1981)).

Specifically, the *CRY* Court concluded that the DEP had a right or interest related to the claim because the DEP "is the agency of government responsible for regulating harm-

ful pollution of the kind alleged in this lawsuit." *CRY*, 536 Pa. at 469, 640 A.2d at 376. It concluded that the nature of the DEP's right or interest was that its "regulatory activity and authority may be affected by an adjudication of this lawsuit." *Id.* at 469–70, 640 A.2d at 376. The Court further concluded that the DEP's interest was essential to the merits of the issue "[b]ecause [DEP's] regulatory activity may be affected by any order entered in this case, and because compliance with that order may require the cooperation of [DEP]." *Id.* at 470, 640 A.2d at 376 Finally, the Court found that, if DEP "were not a party to this suit, it may withhold permits necessary to carry out remedies which may be ordered or it may seek to commence a multiplicity of actions in which the same or related matters are at issue." *Id.*

In *Centolanza v. Lehigh Valley Dairies, Inc.*, 540 Pa. 398, 658 A.2d 336 (1995), our Supreme Court further refined the criteria for an indispensable party. The Court considered whether it had jurisdiction over a case involving private citizens' attempt to obtain an order under the Pennsylvania Storage Tank and Spill Prevention Act[4] directing storage tank owners to make payments to them for anticipated oil contamination clean-up costs and diminution in the value of property because the Centolanzas had failed to join the DEP as an indispensable party pursuant to *CRY*.

The *Centolanza* Court concluded that, even though DEP had a right or interest in the claim as the agency responsible for regulating harmful pollution of the kind alleged and its regulatory activity and authority could be affected by an adjudication in the case, DEP was not an indispensable party. The Court found that DEP's interest was not essential to the merits of the issue, that the Centolanzas did not allege that the Commonwealth failed to halt, cease, or abate the nuisance and that the Centolanzas did not request any type of relief directly involving the Commonwealth. Additionally, the Court noted that the DEP's cooperation in the matter was unlikely because in its brief, it

---

4. Act of July 6, 1989, P.L. 169, *as amended*, 35 P.S. §§ 6021.101—6021.2104.

insisted that a court was powerless to order certain relief. *See also County of Elk v. Highland Township,* 677 A.2d 398 (Pa. Cmwlth.1996), where we held that the DEP was not an indispensable party to an action against a county for its distribution of national forest grants due to DEP's collection-type responsibilities under the Single Audit Act of 1984 [5] because the plain language of the Act establishes that the independent auditor, and not the DEP, makes findings as to all aspects of the county's use of the grants and that therefore, the DEP has no regulatory power over the subject of the action against the county.

In the case before us, the DEP has even less of an alleged stake in the outcome of the case than it did in *Centolanza.* The DEP has no real interest in the Township's attempt to enforce its zoning ordinances or to abate an alleged nuisance. *See Pastore v. State System of Higher Education,* 152 Pa. Cmwlth. 111, 618 A.2d 1118, 1123 (1992) (holding that the Commonwealth Court had no original jurisdiction to try any constituent actions for negligence or nuisance, on the part of the state, under common law). The DEP has its own consent order with the Stines which it can choose to enforce if it believes that the Stines are in violation. In addition, DEP regulations are not an issue here.

■ Where, as here, the Township is seeking to enforce its own ordinances and to abate a common law nuisance, it is simply too much of a stretch to conclude that, merely because the DEP has a consent order with the Stines, the Township's code enforcement action should be in our original jurisdiction. *Compare Arsenal Coal Co. v. Department of Environmental Resources,* 505 Pa. 198, 477 A.2d 1333 (1984), where the Supreme Court held that this Court erred in refusing to exercise our original jurisdiction.

There, however, the Supreme Court held that in a case involving an Environmental Quality Board regulation of state-wide impact, we erred in failing to exercise original jurisdiction where the contested regulation arguably could affect the day-to-day operations of an entire industry. That is not the case here.

### CONCLUSION

Accordingly, for the above reasons, we hereby affirm the trial court's December 7, 1995 order.

### *ORDER*

AND NOW, this 15th day of November, 1996, the order of the Court of Common Pleas of Northampton County dated December 7, 1995 is hereby affirmed.